IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PATSY WERNER,                           )
                                        )
                Plaintiff,              )  Case No. CV06-600-HU
                                        )
        vs.                             )      FINDINGS AND
                                        )      RECOMMENDATION
MICHAEL J. ASTRUE,                      )
Commissioner of Social Security,        )
                                        )
                Defendant.              )
_____     )

Tim Wilborn
Wilborn Law Office, PC
19093 S. Beavercreek Road, PMB # 314
Oregon City, Oregon 97045
        Attorney for plaintiff

Karin J. Immergut
United States Attorney
District of Oregon
Neil J. Evans
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204

1   - FINDINGS AND RECOMMENDATION

David M. Blume
Assistant Regional Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington 98104
    Attorneys for defendant

HUBEL, Magistrate Judge:

Patsy Werner brought this action pursuant to Section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying her application for disability insurance benefits.

### Procedural Background

Ms. Werner filed for Title II benefits in January 2002. She alleges disability since April 14, 2001, on the basis of depression, fibromyalgia, fatigue, headaches, pain, dizziness, anxiety, and irritable bowel syndrome (IBS).

Ms. Werner's applications were denied initially and on reconsideration. A hearing was held on February 5, 2004, before Administrative Law Judge (ALJ) Dan R. Hyatt. Ms. Werner testified, as did a vocational expert (VE), Sharon Washington-Clarke. On April 28, 2004, ALJ Hyatt issued a decision finding Ms. Werner able to perform her past relevant work as a secretary, and therefore not disabled. The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.

### Factual Background

Born in January 1947, Ms. Werner was 57 years old at the time of the ALJ's decision. She has a high school education and past relevant work as a customer service representative and secretary. She last worked in April 2001 as a customer service representative.

**Medical Evidence**

In June 1995, Ms. Werner was diagnosed with fibromyalgia, sleep disturbance, mild depression and probable irritable bowel syndrome by Kelly Krohn, M.D. Tr. 526. Dr. Krohn urged her to become more active, doing daily stretching exercises and embarking upon "some sort of aerobic fitness program." Id. On August 1, 1996, Dr. Krohn diagramed 14 trigger points. Tr. 530.

On May 13, 1997, Ms. Werner was seen by Roderick Hooker, M.D. Tr. 550. He wrote that he concurred with earlier diagnoses of fibromyalgia, although he had observed that "[t]ender points are mild, and not very characteristic of fibromyalgia." Id.

In January 2000, Ms. Werner began treatment with Richard Gundry, M.D. for fibromyalgia flare-ups. She reported a long history of myofascial pain, and a previous diagnosis of fibromyalgia. Tr. 608. Dr. Gundry wrote that she had had "extensive lab workups in past ... all negative/normal." Id. Upon examination, she had diffuse tenderness at the left elbow, but no trigger point tenderness of the upper torso. Tr. 609. Dr. Gundry wrote, "prob[able] fibromyalgia, but at this time without classic

tender points." Id. He thought the left elbow pain was probably secondary to tendinitis. Id.

In April 2000, Ms. Werner reported to Dr. Gundry that she occasionally staggered and stumbled when she walked. Tr. 602. A chart note dated March 1, 2001, indicates that Ms. Werner had begun caring for her mother, who had developed dementia and begun wandering. Tr. 600. Ms. Werner complained of sleep deprivation, but Dr. Gundry wrote, "[Patient] has done surprisingly well, taking care of mother at night and full-time job during day." Id.

On March 20, 2001, Ms. Werner resumed seeing Dr. Gundry, saying she was upset about her mother's condition. Tr. 598. She was tearful and reported crying at work and having no energy, but she denied suicidal thoughts. Id. She was started on Prozac. Id. Dr. Gundry wrote a note excusing Ms. Werner from work for a week due to depression and anxiety. Tr. 599.

On April 27, 2001, Dr. Gundry completed a certification for medical leave through April 30, 2001. Tr. 596. On June 4, 2001, Dr. Gundry completed a form stating that Ms. Werner had disseminated lupus erythematosis and fibromyalgia. Tr. 649. He thought she was capable of sitting eight hours in a work day, standing three hours, and walking one hour, or of alternating between sitting and standing every two hours. Id. Dr. Gundry wrote that her prognosis was fair, and that he was unable to determine when Ms. Werner could return to work. Id.

On June 12, 2001, Ms. Werner saw Gary Sultany, M.D., a rheumatologist. Tr. 651. Ms. Werner thought she might have lupus, but Dr. Sultany wrote, "on more careful questioning, she mainly complains of depression." Id. Dr. Sultany noted that Ms. Werner said she got improvement in her joint symptoms from mineral water. Id. She related that she had developed some weakness and numbness  in the left foot in early April, but that this was now improved. Id.

General examination was unremarkable. Id. She did not have widespread trigger point tenderness. Id. Upper extremities showed no specific arthritis and there was full closure of both hands. The wrists, elbows and shoulders all moved well. Id. Lower extremities also showed good motion at the hips, knees, ankles and toes. She had some weakness to dorsiflexion at the left foot, but was able to stand and walk without difficulty. Laboratory results were normal. Id.

Dr. Sultany wrote that there was no evidence that she had lupus, but that depression was "possibly a major issue," although he left this to her primary care provider. Id. Dr. Sultany told Ms. Werner he could not sign any disability papers for her, because she did not have lupus or any inflammatory connective tissue disease. Id. Dr. Sultany wrote, "In fact, I don't find evidence of fibromyalgia at this time." Id.

///

On June 21, 2001, Dr. Gundry noted that Ms. Werner said she had seen Dr. Sultany, who "didn't think she had lupus or fibromyalgia." Tr. 594. Dr. Gundry found no trigger points that day, and wrote: "I believe patient's main problem is depression, not lupus or fibromyalgia." Id.

On July 13, 2001, Dr. Gundry completed a certification for approximately six weeks of medical leave, stating that Ms. Werner had clinical depression with marked fatigue and emotional lability. Tr. 592.

On July 27, 2001, Dr. Gundry noted that Dr. Sultany did not think Ms. Werner had fibromyalgia. Tr. 676. Dr. Gundry wrote, "main problem is depression, not fibromyalgia or lupus (I don't think she ever had fibromyalgia or lupus)." Id.

In August 2001, Ms. Werner began monthly treatment for depression with James Douglas, M.D., a psychiatrist. Tr. 630-31. On August 21, 2001, Ms. Werner reported to Dr. Douglas that Effexor was working well and her depression was better, but her fibromyalgia was worse, and that she was tired, wanting "to sleep around the clock." Tr. 630. Dr. Douglas cut her Effexor dose and put her on Ritalin. Id.

On September 13, 2001, Ms. Werner reported that she had experienced some increase in energy with Ritalin, but that her profound fatigue remained. Tr. 629. She was started on Dexedrine. Id. On September 27, 2001, Ms. Werner reported feeling better on

Dexedrine and sleeping well. Tr. 628. Dr. Douglas thought her major depressive disorder "much improved." Id. He increased the Dexedrine dosage. Id.

On October 11, 2001, Dr. Douglas wrote that Ms. Werner said her mood was "not good," and that she was "sleeping most of the time." She said her initial response to medication was dissipating. Tr. 627. Dr. Douglas noted that she was able to smile and laugh during the interview. Id. He increased her Dexedrine dosage. Id.

On November 1, 2001, Ms. Werner reported more activity, but still sleeping most of the time. Tr. 626. Dr. Douglas wrote that Ms. Werner's major depressive disorder was "moderate, very somatic in complaints." On November 20, 2001, Ms. Werner was restarted on Effexor. Id. On November 28, 2001, Dr. Douglas noted that Ms. Werner reported that she was still having difficulty functioning and that she described her fibromyalgia pain as severe and her depression symptoms as unabated. Tr. 625. Dr. Douglas noted that her major depressive disorder was "moderate, strong emphasis on somatic complaints." Id.

In December 2001, Ms. Werner reported to Dr. Douglas that her insurance carrier had refused her application for disability. Tr. 624. She reported the pain from her fibromyalgia as severe. Id. Dr. Douglas wrote, "Affect tearful. Would occasionally laugh, though." Id. He rated her major depressive disorder as moderate.

_Id._ On January 7, 2002, Ms. Werner told Dr. Douglas she continued to feel depressed, but had days when she felt better. Tr. 623. She discussed some goals for the future. _Id._ Dr. Douglas wrote that she was "improved." _Id._

On February 4, 2002, Ms. Werner reported that she had been more active, but felt "slightly worse as far as fibromyalgia." Tr. 622. She said her mood was improving, and she associated this with the weather. _Id._ Dr. Douglas assessed her condition as "stable." _Id._

On March 5, 2002, Dr. Douglas again assessed Ms. Werner as stable, after she reported improvement with sleeping and increased energy on Dexedrine. Tr. 621. Ms. Werner reported doing her laundry and attending to activities of daily living, although her pain continued. _Id._

On March 11, 2002, Ms. Werner was given an evaluation by David Hasleton, M.D., at the request of the Commissioner. Tr. 562. Dr. Hasleton did not have any of Ms. Werner's medical records. _Id._ Dr. Hasleton wrote that Ms. Werner complained of pain in her joints from her head to her back, and that the pain was "tremendously bad for her over the past several years." _Id._ However, she said she took mineral water on and off and said her symptoms resolved completely for a couple of months. _Id._ She had to stop using it because she could not afford it, and afterwards she developed pain to her ankles, knees, hips, elbows and neck as

well as her back. Id.

Ms. Werner complained as well of pain to her right hand. Id. She said any kind of physical exertion made the pain worse. Id.

Dr. Hasleton observed that Ms. Werner walked from the waiting room to the exam room without any difficulties, sat comfortably on the chair, and was able to transfer herself from chair to table, lie down, sit back up and get off the examination table without difficulties. Tr. 563. She was able to remove and put on her shoes without problems. Id. She was alert and oriented and did not appear to be in any acute distress. Her speech was very hurried. Id.

Ms. Werner had range of movement "almost more than the normal limits," and there was no evidence of muscle atrophy, wasting or asymmetry to her upper or lower extremities. Tr. 565. There was no tenderness to her neck or back on palpation, no cervical spine tenderness, and no paraspinous muscle spasm. Id. She had good muscle tone and bulk. Id. Dr. Hasleton wrote,

> As far as the 18 classic musculotendinous tender points for fibromyalgia, I was not able to appreciate any on her. I went through all of them bilaterally. ... She says that due to the pain medication she is taking she is not experiencing them right now and she does not experience it on a full time basis. But she did have quite a few that she said were positive in the past.

///

Id. Ms. Werner's other systems were also normal upon examination. Tr. 565-66. Dr. Hasleton wrote that Ms. Werner's "history of fibromyalgia [is] not evidenced on my exam today with negative tender points," and opined that her possible depression needed to be looked into further. Tr. 566.

On April 9, 2002, Ms. Werner reported to Dr. Douglas "good and bad days," and low energy level. Tr. 620. She said she continued to have severe depression to the point of having difficulty functioning. Id. Dr. Douglas noted that Ms. Werner's depression was severe and assessed her GAF at 50.[1] He wrote, "Not ready to go back to work." Id.

On April 23, 2002, Peter LeBray, Ph.D., performed a records review on behalf of the Commissioner and found that Ms. Werner had an affective disorder, but that she had only mild restrictions in her activities of daily living and in maintaining social functioning; and moderate restrictions in her ability to maintain concentration, persistence, and pace, carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public. Tr. 577,

---

[1] The Global Assessment of Functioning (GAF) Scale is a hypothetical continuum of mental health-illness. A GAF of 60-51 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A GAF of 50-41 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders Text Revision (DSM-IV-TR)* (4th ed.) 34.

581-82.

On May 7, 2002, Ms. Werner reported to Dr. Douglas that her hands were very painful. Tr. 691. Dr. Douglas wrote that her depression was "severe and continues to be worsened by pain." Id. He started her on Celebrex as tolerated. Id. On June 4, 2002, Dr. Douglas wrote that Ms. Werner stated her fibromyalgia was getting worse, as was her depression. Tr. 690. She described continued hopelessness and "sleeping too much." Id. Dr. Douglas characterized her depression as "severe." Id.

On June 6, 2002, Ms. Werner saw James K. Smith, M.D., a rheumatologist. Tr. 687. She complained of arthralgias of the elbows, knees, hands and feet over the past two years. Id. She also reported persistent neck and back pain and a recent episode of left leg weakness and feeling unstable. Id. Ms. Werner said she also had fatigue, headaches, muscle spasms, blurry vision, chest pain, shortness of breath, and diarrhea. Id.

Physical examination was unremarkable. Tr. 650. Dr. Smith wrote, "I agree with the former rheumatology consultants that this patient does not have evidence of inflammatory arthritic disease and that most likely she does have fibromyalgia." Id. He concluded, "At least with regard to her joint and neurologic exam, there was no evidence of any impairment to lead to disability." Id. Dr. Smith wrote that he had informed Ms. Werner that "although she had numerous symptoms .. the diagnosis of

[lupus] requires objective findings such as abnormal blood counts, proteinuria and so forth." Id.

In July 2002, Dr. Gundry charted a visit from Ms. Werner in which she complained of neck pain and bilateral numbness in her hands, as well as vertigo and falling. Tr. 678. She said her left leg had been weak for the past year, and now her right leg was getting weak as well. Id. Dr. Gundry wrote,

> [Patient] says she has fibromyalgia but I don't think so--no pressure points ... no physical signs to go with her symptoms (e.g., leg weakness). ... Current problem is that she has run out of all her meds for a week, including Effexor ... she is prob[ably] having withdrawal.

Id. Dr. Gundry restarted her medications, then wrote, "Explain to [patient] that using a chain saw is not good aerobic exercise; try graduated walking and bike riding." Id.

On July 30, 2002, Dr. Douglas saw Ms. Werner and noted, "Depression does continue, although patient does struggle to maintain activities." Tr. 789. He characterized her depression as "recurrent." Id. That same day, Dr. Douglas completed a questionnaire submitted by Ms. Werner's lawyer. Tr. 631. He rated her current GAF at 50 and her highest GAF for the past year at 60. Id. Dr. Douglas rated Ms. Werner's limitations in maintaining social functioning as "marked,"[2] and opined that she would have

---

[2] Defined on the form as "more than moderate but less than extreme," with a marked limitation arising when "several activities or functions are impaired or even when only is impaired, so long as the degree of limitation is such as to seriously interfere with the

12  - FINDINGS AND RECOMMENDATION

"frequent" deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner, and "continual" episodes of deterioration or decompensation in work or work-like settings which "cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms." Tr. 636.

On August 6, 2002, Dr. Gundry saw Ms. Werner. Tr. 680. He wrote that she had not fallen recently, but "tends to stagger." Id. He noted that she said she was having good and bad days and "seems to have fibromyalgia-type pains," as well as diarrhea, muscle cramps, and headaches. Id. Despite having written in his July 2002 chart notes that he did not think Ms. Werner had fibromyalgia because there were no physical signs to go with her symptoms, Dr. Gundry diagnosed fibromyalgia, IBS and headache. Id.

On August 30, 2002, Dr. Douglas noted that Ms. Werner reported feeling slightly worse than usual, and said she was very limited as a result of pain from fibromyalgia. Tr. 688. No explanation was offered for the sudden change of opinion from Dr. Smith and others. Tr. 650. Dr. Douglas wrote, "Major Depression. Sl. Worse." Tr. 688. He decreased her dosage of Effexor and increased her Dexedrine. Id.

---

ability to function independently, appropriately and effectively." Tr. 636.

On September 6, 2002, Dr. Gundry completed a questionnaire submitted by Ms. Werner's lawyer. Tr. 638. Dr. Gundry stated that he thought Ms. Werner met the American Rheumatological criteria for fibromyalgia, though he did not specify what these criteria were, nor what findings he saw that met them. He also offers no explanation of the radical change of opinion from June 21, 2001, tr. 594, and August 20, 2003, tr. 864. Tr. 638. He also thought she also had depression. Id. In Dr. Gundry's opinion, Ms. Werner's pain was frequently severe enough to interfere with attention and concentration, but he thought, on the basis of the history he obtained from Ms. Werner, that she was capable of low stress jobs. Tr. 641. Dr. Gundry thought she was able to sit for only 10 minutes at a time and stand for 15 minutes at a time, and that during an eight hour working day, she could stand or walk less than two hours and sit about two hours. Tr. 642. Dr. Gundry thought Ms. Werner would be likely to be absent from work more than four times a month as a result of impairments or treatment. Tr. 644. In his opinion, Ms. Werner had been unable to work since April 21, 2001, in stark contrast to his detailed findings on June 4, 2001 regarding her abilities to sit, stand and walk during an eight hour work day. Tr. 649, 645.

On September 30, 2002, Dr. Douglas wrote that Ms. Werner reported feeling much better over the past month, with more energy. Tr. 686. However, her physical pain had been worse. Id.

She thought her current medication was "just right." Id. Dr. Douglas wrote that her depression was "improved," but that her "fibromyalgia pain remains." Id.

On October 21, 2002, Dr. Gundry noted that he had seen Ms. Werner for "fibromyalgia pain" and panic attacks. Tr. 682. She had run out of her medications and had not taken anything for approximately a week. Id. Dr. Gundry thought she was experiencing the symptoms of multiple drug withdrawal, with fibromyalgia, panic attacks, and depression. Id.

On January 3, 2003, Dr. Douglas noted that Ms. Werner complained of feeling "very sick," including dizziness and headache "which progressed to nausea," like "her usual migraine." Tr. 685. Ms. Werner attributed this to having her electricity being out and being cold. Id. She also described worsening fibromyalgia pain. Dr. Douglas wrote that her depression was "sl. worse," and that her fibromyalgia was worse. Id.

On February 4, 2003, Dr. Douglas wrote that Ms. Werner said she was sleeping most of the day and that she had stopped taking Dexedrine because it was not working. Tr. 684. She said her energy was very low and her mood was depressed. Id. Dr. Douglas discontinued the Dexedrine and started her on Cytomel. He noted that her depression was "refractory." Id.

On March 31, 2003, Ms. Werner saw Dr. Douglas. Tr. 683. Ms. Werner reported very low energy, sleeping much of the day, and

little hope for the future. Id. Dr. Douglas thought her depression was worse. He restarted her on Dexedrine and prescribed Klonopin and Effexor. Id.

On June 24, 2003, Ms. Werner was given a neuropsychological screening examination by Joe Wood, Psy.D. Tr. 703-719. Dr. Wood administered Wechsler Adult Intelligence Scale, Third Edition (WAIS-III), on which Ms. Werner obtained a full scale IQ of 114, in the high average range. Tr. 707.

On the Working Memory Index, which provides information about an individual's ability to attend to verbally presented information, process information in memory, and then formulate a response, Ms. Werner's performance was in the average range. Tr. 708. On the Processing Speed Index, which provides a measure of an individual's ability to process simple or routine visual information quickly and efficiently, and to perform tasks based on that information, Ms. Werner scored in the average range. Tr. 708.

Ms. Werner's responses on the MMPI-2 profile indicated the possibility of a Somatoform Disorder and the possibility of some depression. Tr. 713. However, Dr. Wood was hesitant to make a diagnosis of Somatoform Disorder because none of her records indicated such a diagnosis; he also concluded that Ms. Werner's reported symptoms did not meet the criteria for a Major Depressive Disorder, although she had some symptoms associated

with depression. Id.

Ms. Werner told Dr. Wood she had been diagnosed with fibromyalgia approximately 10 years earlier, but that she had it long before the diagnosis. Id. She reported her current symptoms as headaches, joint and muscle pain in her shoulders and neck, numbness in her hands, pain with the use of her hands, especially with rotation, and dropping things. Id. She also reported "migraine hallucinations" decreased concentration, and tinnitis. Id.

Dr. Wood noted that although Ms. Werner reported numbness and difficulty with rotation, "she demonstrated no difficulty with writing during the evaluation or coming and going through doors." Id. In addition, she reported that she paints, carves, sews, does sculptures and builds things like birdhouses and a birdbath. Id. Dr. Wood wrote, "She may have difficulty manipulating her hands, but she reported engaging in activities that involve her in using her hands a great deal." Id.

Dr. Wood's diagnostic impressions were depressive disorder, not otherwise specified; rule out somatoform disorder; and histrionic features. Tr. 714.

On August 20, 2003, Dr. Gundry wrote notes on a consult with Dr. Wood. Tr. 863. Dr. Gundry wrote, "I believe she does have somatoform disorder. ... Patient's pain is still real." Id. Dr. Gundry's notes state that he does not feel she has

fibromyalgia, but that she does have depression and somatoform disorder. Tr. 864. Dr. Gundry wrote, "[Patient] of course disagrees with my assessment. I tell [her] I don't think my writing her a letter will help her cause." Id.

On September 30, 2003, Dr. Douglas completed a questionnaire generated by Ms. Werner's attorney. Tr. 723. Dr. Douglas stated that he had been treating Ms. Werner since August 28, 2001. Id. In Dr. Douglas's opinion, Ms. Werner had marked limitations in her activities of daily living and in her social functioning, noting that she had "less than 2 weekly interpersonal contacts." Tr. 723-24. Dr. Douglas rated her concentration, persistence or pace as moderately limited, noting that she had "difficulty maintaining cohesive line of thinking for more than 2-3 minutes." Tr. 725. Dr. Douglas predicted that Ms. Werner would have repeated episodes of decompensation[3] because "[w]hen patient can't afford medications or runs out she has a very predictable worsening of apathy and [activities of daily living] almost cease." Tr. 726-27.

On July 8, 2004, Dr. Douglas wrote a letter in response to the ALJ's unfavorable decision. Tr. 879. Dr. Douglas disagreed with the ALJ's finding that Dr. Douglas's clinical notes were contradictory, saying, "This is typical with the course of major

---

[3] The attorney's questionnaire defined "decompensation as "like an emotional withdrawal--all shook up--or emotional overload--going to pieces." Tr. 875.

depressive disorder. ... The fact that the notes seem to contradict each other over time simply indicates that she had fluctuating levels of impairment." Id. Dr. Douglas also pointed out that all the assessments performed by himself and Dr. Wood were based on Ms. Werner's subjective statements, even the MMPI. Tr. 879.

### Hearing Testimony

Ms. Werner testified that she was working as a customer service representative in March 2001, when "one day I just couldn't stop crying." Tr. 889. After trying different medications, her doctor put her on Effexor, with which Ms. Werner found she could "get it under control." Tr. 890. Ms. Werner said she had continued to take Effexor except for a period the previous summer, when she stopped taking it for two days and began having panic attacks. Id. She continues to see Dr. Douglas once a month. Tr. 891. Her other medications are clonazepam and dextroamphet. Tr. 893. Dextroamphet is a stimulant and clonazepam is for anxiety. Id.

Ms. Werner testified that as a hobby, she did make a birdbath in 2001, which involved "scoop[ing] out a place in the ground, put[ting] down some plastic and then put[ting] some cement on top of that." Tr. 897. She had not made a birdhouse since March 2001. Id. She painted a little, but had not done so since the previous summer. Id. She said she "used to be an avid

reader," but no longer read because she was unable to stay focused. Id. Ms. Werner testified that the previous day, she had sanded an old sewing machine cabinet with an electric sander. Id.

Ms. Werner testified that she was unable to work because she was unable to remember things, and because of bowel incontinence, for which she was taking Imodium. Tr. 898. However, Ms. Werner testified that she had had a colonoscopy and that her "colon and bowel are very healthy and normal." Tr. 899. She said one of her doctors thought the diarrhea might be the result of lactose intolerance, but said "it really doesn't matter what I eat." Tr. 900. Ms. Werner also testified that her hands were painful, her back ached, and her knees hurt, with her left knee having "given out" several times on stairs. Tr. 902-03.

The ALJ did not ask the VE a hypothetical question, but did inquire whether Ms. Werner's past work as a secretary had involved less than occasional contact with the public. Tr. 907.

**ALJ's Decision**

The ALJ found that Ms. Werner had a history of depressive symptoms, for which she had been followed by Dr. Gundry and Dr. Douglas. Tr. 25. He noted that Dr. Douglas had stated that Ms. Werner's depression waxed and waned, improved on medication, but that in April 2002, Dr. Douglas had stated that her depression was debilitating to the point that she had profound difficulty functioning and could not work. Id. The ALJ rejected this opinion

of Dr. Douglas, on the ground that it was conclusory and without supporting clinical findings. The ALJ wrote, "At the time, the claimant's mental status testing was not remarkable and her mental status was generally intact throughout Dr. Douglas's office notes. He noted that she had a strong somatic focus to her complaints, a factor that is apparent throughout the record." Id.

The ALJ considered Dr. Douglas's July 2002 assessment of Ms. Werner's mental functioning, with its diagnoses of depression and fibromyalgia, and Dr. Douglas's opinion that Ms. Werner would have trouble completing an eight-hour day and would be absent from work more than four times per month, as well as having marked restrictions in concentration, persistence, pace, and social functioning and continual episodes of decompensation. Id. The ALJ stated that the report was given some weight, but that because it was prepared on a check-box form without reference to specific clinical findings, it was not convincing. Id. The ALJ also compared the report with Dr. Douglas's notes showing that Ms. Werner's mental status functioning was not particularly remarkable during that time, and to his assessment of GAF levels at 50 to 60, which was inconsistent with the limitations stated in the report. Id.

The ALJ gave said he had also rejected Dr. Douglas's opinion because of unexplained discrepancies in a single report between the existence of suicidal ideation and the absence of

21 - FINDINGS AND RECOMMENDATION

such ideation. Tr. 26.

The ALJ noted Dr. Wood's examination, which found that Ms. Werner's mental status was intact and she was functioning at the high average range of cognition, with average to superior IQ levels, memory and processing speed. Tr. 26. The ALJ noted that Dr. Wood had found Ms. Werner's depression did not rise to the level of a major depressive disorder, and that her MMPI-2 profile indicated a possible somatoform disorder. Id. The ALJ accepted Dr. Wood's diagnoses of depressive disorder, tr. 29, as well as his conclusion that Ms. Werner would have only slight restrictions in her ability to interact with the public and with supervisors, and no other functional limitations. Id. The ALJ concluded that Dr. Wood's conclusions suggested that any mental impairments were not severe.

The ALJ noted discrepancies between Ms. Werner's statements to Dr. Wood that she had difficulty finding the restroom at his offices, and that she bathed very seldom, with Dr. Wood's observation that she had driven alone to the appointment and that her physical presentation belied her assertions of minimal personal hygiene. Id. The ALJ also took note of Dr. Wood's observation that Ms. Werner had no difficulty using her hands at the examination, which was inconsistent with Ms. Werner's assertion that she had numbness and difficulty with her arms and hands, and her description of a range of daily activities

inconsistent with the reported hand and arm symptoms. Id. The ALJ used these observations by Dr. Wood as a partial basis for finding Ms. Werner less than fully credible. Id.

The ALJ also considered Dr. Douglas's September 2003 report, in which Dr. Douglas stated that Ms. Werner had marked limitations in daily living activities and social functioning, moderate difficulty in concentration, persistence, and pace, repeated episodes of decompensation, and marginal adjustment. Id. The ALJ acknowledged that Dr. Douglas's September 2003 report "suggests a disabling impairment that would meet a listing, and it is from a treating source who has met with the claimant numerous times," and stated that the assessment had been given "very close attention." Id. Nevertheless, the ALJ concluded that the evidence did not support Dr. Douglas's assessment because 1) his comments were prepared on a check-box form with no clinical support; 2) there were inconsistencies between her reports to Dr. Wood about her daily living activities and her statement to Dr. Douglas that she slept over 16 hours a day and did not clean her house; 3) Ms. Werner's statement to Dr. Douglas that she had less than two weekly interpersonal contacts, which was inconsistent with his note that she had reported having numerous supportive friends and family members, and her sister's report that she saw Ms. Werner on an almost daily basis; 4) Dr. Douglas's finding that Ms. Werner had difficulty maintaining a cohesive line of

thinking for more than two to three minutes was contradicted by
Dr. Wood's contrary finding based on cognitive testing; 5) the
absence of any evidence of decompensation in Dr. Wood's report or
Dr. Douglas's office notes; and 6) Dr. Gundry's agreement with
Dr. Wood's report.

The ALJ reviewed Dr. Douglas's response to Dr. Wood's
report and Dr. Douglas's opinion that Ms. Werner could not
perform even basic functions most of the time and was unable to
perform most, if not all, vocations. Tr. 27. The ALJ found that
Ms. Werner's statements to Dr. Douglas were "so lacking in
credibility that any conclusions based on them are suspect." Id.
The ALJ found that Dr. Douglas had consistently reported that Ms.
Werner had no suicidal ideation, numerous supportive friends and
family, no history of suicide attempts, and normal speech and
goal-directed thinking. Id. The ALJ found these comments
inconsistent with Dr. Douglas's conclusions. Id.

For these reasons, the ALJ gave no weight to Dr. Douglas's
assessments of Ms. Werner's functioning. He found Dr. Wood's
opinions more reliable than those of Dr. Douglas, because Dr.
Wood administered clinical tests while Dr. Douglas relied on Ms.
Werner's subjective statements. Id. The ALJ gave Dr. Wood's
assessment very substantial weight. Id. He concluded that the
effects of her "histrionics and mental disorders" had some impact
on her level of physical functioning, and "are taken into account

in assessing her physical residual functional capacity." Tr. 29.

With respect to Ms. Werner's physical limitations, the ALJ rejected Dr. Gundry's June 2002 opinion that Ms. Werner would be capable of only low stress jobs, and that she would have frequent interference with attention and concentration. Tr. 28. One reason for the ALJ's rejection of this opinion was that the report was a check-box form without specific and sufficient clinical evidence to support it; the ALJ noted that despite Dr. Gundry's assertion that Ms. Werner's condition was shown by multiple tender points, "neither he nor other examination sources found any." Id. The ALJ thought Dr. Gundry's report was based entirely on Ms. Werner's subjective comments and not on medically determinable impairments. Further, the ALJ noted that Dr. Gundry eventually concluded that Ms. Werner did not have fibromyalgia. Id.

The ALJ also rejected Dr. Gundry's report because in March 2001, Dr. Gundry had opined that Ms. Werner could return to work on March 27, 2001, and another medical source reported in April 2001 that Ms. Werner could return to work on April 30, 2001. The ALJ found that "these reports suggest that any restriction in working was brief." Id. For these reasons, the ALJ found Dr. Gundry's June 11, 2002 report not convincing.

The ALJ also rejected Dr. Douglas's June 2002 opinion that Ms. Werner would miss four days of work a month because of her

fibromyalgia and depression. Id. The basis for the ALJ's rejection of this evidence was that it was based only on Ms. Werner's comments, not on objective findings. The ALJ rejected Dr. Douglas's September 2003 opinion that Ms. Werner's pain in her joints required a change of position more than once every two hours, because he was "not specific about these limitations," and the "evidence overall does not support them." Id. Further, the ALJ found, Dr. Douglas is a psychiatrist and the "record does not show any physical tests by him. He relied on the claimant's subjective statements only." Id.

The ALJ found the fact that Ms. Werner did not take any pain medication inconsistent with her pain complaints. Tr. 29. He found further that the psychological tests "show a somatic focus to the claimant's complaints," and that testing "has not supported her complaints." Id.

The ALJ found that Ms. Werner did not have fibromyalgia, IBS, a headache syndrome, or any other severe physical impairment. Tr. 29. The ALJ noted that Dr. Hooker found in 1997 that Ms. Werner had tender points, but that they were mild and not characteristic of fibromyalgia; Dr. Smith thought Ms. Werner "most likely" had fibromyalgia, but Dr. Sultany, a rheumatologist, did not find evidence of fibromyalgia, and neither did Dr. Hasleton. Id.

The ALJ found not credible Ms. Werner's testimony that she

had four episodes of bowel incontinence a week, based on her statement in an interview with her attorney in September 2003 that she had four accidents a month, but that this was a "recent deterioration," and before September 2003, she had only one or two accidents a year. Id., citing tr. 457-58.

The ALJ noted Ms. Werner's reports of daily headaches with severe pain, but found "no medical reports of severe headaches," and other reports that showed "her headaches happened only once a month." Id.

The ALJ accepted comments by third parties, including Ms. Werner's former husband, who said she took care of herself and that her limitations occurred only during occasional flares of pain; others who said she had poor concentration and minor difficulty getting along with others, based on Ms. Werner's subjective statements; a friend who reported that Ms. Werner could manage daily activities and socialize on occasion, but that she kept a messy house at times; and Ms. Werner's sister, who reported that Ms. Werner socialized little, but saw family members often and had no difficulty dealing with them. Tr. 30. The ALJ noted reports that Ms. Werner shopped, visited, had an adequate memory, and managed household chores and personal care to an extent. Id. The ALj found these reports "credible to the extent that they are consistent with the reliable medical records," and "fully consistent with a histrionic personality."

Id.

     The ALJ noted Dr. LeBray's report, but because Dr. Wood's report did not disclose significant problems with concentration, the ALJ rejected Dr. LeBray's opinion that Ms. Werner had moderate limitations in the areas of concentration, persistence and pace. Tr. 30.

     The ALJ found that

> on the whole, the claimant has very little credibility. She has exaggerated her condition, asserting many different symptoms and limitations with no etiology to explain them. She has an affective disorder, possibly depression, but some of these symptoms were situational. ... [H]er symptoms have varied greatly by self report. Dr. Wood's report showed a depressive disorder, with no limitations other than slight deficit dealing with others.

Id. The ALJ found that Ms. Werner had "presented as rather histrionic, a pervasive and excessive emotionality and attention-seeking behavior." Id.

     The ALJ concluded that Ms. Werner had mild limitations in daily living activities, moderate difficulty with social functioning, and no difficulty with concentration, persistence or pace, and no episodes of decompensation. Id. He concluded that she had the residual functional capacity to return to her past relevant work as a secretary. Tr. 30-31.

### Standards

     The initial burden of proving disability rests on the claimant. Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.

In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

If you do not have any impairment or combination of

> impairments which significantly limits your physical
> or mental ability to do basic work activities, we
> will find that you do not have a severe impairment
> and are, therefore, not disabled. We will not
> consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step. Yuckert, 482 U.S. at 141.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 140-41. If a claimant's impairment meets or equals one of the listed impairments, he is considered disabled without consideration of her age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he is not considered disabled. Yuckert, 482 U.S. at 141-42. If the claimant shows an inability to perform his past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity to do other available work in consideration of the claimant's age, education

and past work experience. <u>Yuckert</u>, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

## Discussion

Ms. Werner asserts that the ALJ erred by rejecting the opinions of Dr. Gundry and Dr. Douglas, which are consistent with disability; by rejecting third party testimony; by rejecting the assessment of Dr. LeBray that Ms. Werner had moderate limitations in the areas of concentration, persistence and pace; and by finding that Ms. Werner had no severe physical impairments at step two of the sequential analysis.

1.  <u>Did the ALJ err in rejecting the opinions of Doctors Gundry and Douglas in favor of those of Dr. Wood?</u>

Generally, the opinion of a treating practitioner, such as Dr. Gundry or Dr. Douglas, carries more weight than the opinion of an examining practitioner, such as Dr. Wood, and an examining practitioner's opinion carries more weight than that of a reviewing practitioner such as Dr. LeBray. 20 C.F.R. § 404.1527(d). <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1202 (9th Cir. 2001). As specialists, the opinions of Dr. Douglas, Dr. Wood and Dr. LeBray's on mental impairments carry more weight than those of Dr. Gundry. <u>Holohan</u>, 246 F.3d at 1202; § 404.1527(d)(5).

If a treating physician's medical opinion is inconsistent with other substantial evidence in the record, treating source medical opinions are still entitled to deference and must be

weighted using all the factors provided in 20 C.F.R. § 404.1527. Id., citing SSR 96-2p. An ALJ may rely on the medical opinion of a non-treating doctor instead of the contrary opinion of a treating doctor only if she or he provides "specific and legitimate" reasons supported by substantial evidence in the record. Holohan, 246 F.3d at 1202. If a treating physician's opinion on the issue of disability is controverted, the ALJ must still provide "specific and legitimate" reasons in order to reject the treating physician's opinion. Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998).

a.   Opinions of Dr. Gundry

Dr. Gundry's treatment notes are contradictory on the question of whether Ms. Werner had fibromyalgia. In June 2000, he noted that Ms. Werner did not have the classic tender points of fibromyalgia. In June 2001, Dr. Gundry thought Ms. Werner had disseminated lupus erythematosis and fibromyalgia, but after he reviewed Dr. Sultany's findings that same month, he concluded that she had neither. In July 2001, Dr. Gundry revised his diagnosis to clinical depression with marked fatigue and emotional lability. In July 2002, Dr. Gundry again noted an absence of fibromyalgia trigger points, and thought Ms. Werner's complaints were due to withdrawal from medications. In August 2002, Dr. Gundry characterized Ms. Werner's physical complaints as "fibromyalgia-type" pains, diarrhea, muscle cramps and

headaches.

But in September 2002, Dr. Gundry stated that he thought Ms. Werner met the criteria for fibromyalgia, although he neglected to identify which criteria he found were met; he thought she also had depression. At that time, Dr. Gundry gave his opinion that Ms. Werner was able to sit for only 10 minutes at a time, stand for 15 minutes at a time, and stand, sit or walk less than two hours out of an eight hour workday. He thought Ms. Werner would be likely to absent herself from work more than four times a month, but did not specify whether these absences would be due to fibromyalgia or depression.

In October 2002, Dr. Gundry again wrote that he thought Ms. Werner had fibromyalgia, panic attacks and depression. In August 2003, after consulting with Dr. Wood, Dr. Gundry wrote that he thought Ms. Werner had somatoform disorder, and emphasized that Ms. Werner's pain was real. He no longer believed she had fibromyalgia, but continued to think she had depression.

The ALJ rejected Dr. Gundry's opinion that Ms. Werner had fibromyalgia because neither he nor any other examining physician ever found the tender points characteristic of fibromyalgia. This finding is supported by substantial evidence in the record.

The ALJ rejected Dr. Gundry's opinions about Ms. Werner's physical abilities and her ability to concentrate and pay attention because they were based entirely on Ms. Werner's

subjective statements and not on "medically determinable impairments." I agree that the fibromyalgia diagnosis is not supported by necessary clinical findings, and therefore, to the extent Dr. Gundry's opinion of Ms. Werner's physical capacities and ability to concentrate are based on the existence of fibromyalgia, it was properly rejected.

But Dr. Gundry also opined that Ms. Werner had depression and somatoform disorder. The ALJ specifically found that the effects of Ms. Werner's mental disorders had some impact on her level of physical functioning and that they were "taken into account in assessing her physical residual functional capacity." Tr. 29. Nevertheless, the ALJ rejected Dr. Gundry's opinion that Ms. Werner had depression and somatoform disorder, on the ground that they were not "medically determinable impairments."

There is no indication in the record that Ms. Werner has been diagnosed with somatoform disorder, although Dr. Wood included a "rule out" diagnosis of somatoform disorder because Ms. Werner's responses on the MMPI-2 profile indicated the possibility of both Somatoform Disorder and depression. I therefore find no error in the ALJ's rejection of Dr. Gundry's opinion that Ms. Werner had somatoform disorder.

Dr. Gundry's opinion that Ms. Werner had depression is consistent with Dr. Douglas's diagnosis of Major Depressive Disorder and Dr. Wood's diagnosis of depressive disorder, which

34  - FINDINGS AND RECOMMENDATION

the ALJ accepted.

The ALJ rejected Dr. Gundry's opinion that Ms. Werner would be capable only of low stress jobs, and that she would have frequent interference with attention and concentration, because the opinion was expressed on a check-the-box form.[4] The ALJ found that the opinion was therefore without clinical evidence to support it.

Dr. Gundry does not say whether this opinion is based on the assumption that Ms. Werner had fibromyalgia (for which there is no clinical evidence), lupus, (a diagnosis Dr. Gundry made and then abandoned), somatoform disorder, (which has been suggested by Dr. Gundry, but never diagnosed), or depression. To the extent that Dr. Gundry's opinions are based on fibromyalgia, lupus, or somatoform disorder, I find no error in the rejection of his opinion, because there is no clinical evidence to support the existence of any of these conditions.

Although the ALJ accepted the diagnosis of depressive disorder, similar to the Major Depressive Disorder diagnosed by Dr. Douglas and the depression diagnosed by Dr. Gundry, nowhere

---

[4] I note that Dr. Wood's opinions, which the ALJ accepted, are also expressed on a check-the-box form, without any explanatory narrative except the sentence, "The claimant interacts in an immature and dependent manner based on her responses on testing." Tr. 719. The ALJ cannot accept check-the-box opinions from Dr. Wood, but then reject opinions from Dr. Gundry because they are also check-the-box, especially when Dr. Gundry's records are far extensive.

in Dr. Gundry's records is there any evidence to indicate that Dr. Gundry has based his opinion that Ms. Werner could only perform low stress jobs, and that she would have frequent interference with attention and concentration, on the effects of depression. Moreover, Dr. Gundry's opinion that Ms. Werner would have difficulties with attention and concentration is contradicted by the results of Dr. Wood's cognitive testing in June 2003, which indicated high average intelligence, average performance on the Working Memory Index, and average performance on the Processing Speed Index. I therefore find no error in the ALJ's rejection of Dr. Gundry's opinion.

The ALJ rejected Dr. Gundry's opinions because in 2001, Dr. Gundry had authorized medical leaves for periods of a few weeks; the ALJ inferred that "these reports suggest that any restriction in working was brief." Tr. 28. Although elsewhere in the record, Dr. Gundry stated, on September 6, 2002, that Ms. Werner had been unable to work since April 21, 2001, tr. 645, this opinion is directly contradicted by Dr. Gundry's statement on June 4, 2001 that Ms. Werner was capable of sitting eight hours in a work day, standing three hours, and walking one hour, or of alternating between sitting and standing every two hours. Further, as the ALJ noted, on March 20, 2001, Dr. Gundry stated that Ms. Werner could return to work on March 27, 2001, see tr. 599, and on April 24, 2001, another practitioner had stated that Ms. Werner could

36  - FINDINGS AND RECOMMENDATION

return to work on April 30, 2001. Tr. 597. I find no error by the ALJ.

### b. Opinions of Dr. Douglas

The record indicates that Ms. Werner was treated by Dr. Douglas on a monthly basis for at least two years, from August 2001 to September 2003. The ALJ found that Dr. Douglas's opinions were consistent with disability, tr. 25, 27, but rejected them. The ALJ rejected Dr. Douglas's April 2002 opinion that Ms. Werner's depression was debilitating to the point that she had profound difficulty functioning and could not work because 1) it was "conclusory and without clinical findings to support it;" 2) Ms. Werner's mental status testing was not remarkable; and 3) Dr. Douglas wrote that Ms. Werner's complaints had a strong somatic focus.

### 1.  Clinical findings

Dr. Douglas's opinions are not without clinical findings. Dr. Douglas's treatment records document his own clinical observations, Ms. Werner's statements to him, his assessments of the effectiveness of her medications, and other clinical data which supports his opinions. However, throughout the time covered by Dr. Douglas's treatment, his underlying assumption--which is unsupported by clinical findings-- was that Ms. Werner had fibromyalgia, causing physical pain that exacerbated her depressive symptoms. Dr. Douglas noted on more than one occasion

that Ms. Werner's depressive disorder was "very somatic in complaints," tr. 626, and that Ms. Werner put a "strong emphasis on somatic complaints," tr. 625. Dr. Douglas explicitly linked the severity of Ms. Werner's depression to her fibromyalgia symptoms. See, e.g., tr. 688 (activities "very limited as a result of pain from fibromyalgia;" tr. 691 (depression "severe and continues to be worsened by pain.") Dr. Douglas even went so far as to prescribe Ms. Werner Celebrex, an anti-inflammatory, for her complaints of pain in her hands. Tr. 691.[5]

Dr. Douglas's clinical assessments of Ms. Werner's symptoms are undermined by his assumption that her mental symptoms were linked to severe physical pain, when the medical record fails to reveal the existence of any physical condition that could account for such pain. For example, Ms. Werner complained to Dr. Hasleton on March 11, 2002, of pain in her joints from her head to her back that was "tremendously bad," and pain to her ankles, knees, hips, elbows and neck, and right hand. Tr. 562. Physical examination by Dr. Hasleton revealed that Ms. Werner walked without difficulty, sat comfortably, was able to transfer herself from chair to table, lie down, sit up, get off the examination table, and remove and put on her shoes without difficulty. Tr.

_____

[5] I note that Ms. Werner complained on May 7, 2002 that her hands were "very painful," but that only two months later, in July 2002, Dr. Gundry wrote that he had explained to Ms. Werner that "using a chain saw is not good aerobic exercise." Tr. 678.

563. Her range of movement was "almost more than the normal limits," there was no tenderness to palpation, and she had good muscle tone and bulk. Id.

Again in June 2002, Ms. Werner complained to Dr. Smith of arthralgias of the elbows, knees, hands and feet for the past two years, tr. 687, persistent neck and back pain, left leg weakness, fatigue, headaches, muscle spasms, blurry vision, chest pain, shortness of breath, and diarrhea. Id. However, physical examination by Dr. Smith was unremarkable. Tr. 650. Laboratory results at that time were also normal. Id.

Because Dr. Douglas accepted Ms. Werner's statements of pain, apparently unaware that physical examination had revealed no objective findings or diagnoses whatsoever to account for such pain, and because Dr. Douglas's assessment of Ms. Werner's depression was premised, at least in part, on his assumption that she was in constant pain, the ALJ's finding that Dr. Douglas's opinions lacked clinical findings to support them is not erroneous and is based on substantial evidence in the record.

2. Mental status examinations

Every treatment note submitted by Dr. Douglas contains a box titled "Mental Status Exam." See, e.g., tr. 620, 621, 622. In this box, Dr. Douglas generally wrote, "Alert and oriented x 3. Speech normal in rate and tone and goal directed. Thought form cohesive and coherent without any psychosis or mania. No suicidal

ideation/homicidal ideation." See, e.g., tr. 627, 628, 684, 685.
On one occasion, Dr. Douglas added, "Affect tearful." Tr. 624.
The ALJ rejected all of Dr. Douglas's opinions on the basis of
these unremarkable findings in the "Mental Status Exam" box.

I find no error in the ALJ's rejection of Dr. Douglas's
opinions based on Dr. Douglas's unremarkable mental status
examinations. The mental status notations, indicating that Ms.
Werner was alert and oriented, with cohesive and coherent thought
forms and normal speech, and without signs of psychosis, mania,
or suicidal ideation, belie any clinical basis for Dr. Douglas's
opinion that Ms. Werner would experience repeated episodes of
decompensation. Moreover, the mental status examination findings,
which remained the same for session after session, directly
contradict other statements by Dr. Douglas in his treatment
notes, such as the notation on September 30, 2003, that Ms.
Werner had "difficulty maintaining cohesive line of thinking for
more than 2-3 minutes," tr. 725.[6]

The ALJ rejected Dr. Douglas's July 2002 opinion, in which
he stated that Ms. Werner would have marked difficulty in
maintaining concentration, persistence or pace, and frequent
episodes of decompensation. The ALJ rejected this opinion because
1) it was prepared on a check-box form without reference to

_____

[6] This particular observation by Dr. Douglas is, as the ALJ
noted, also contradicted by the results of the cognitive testing
administered by Dr. Wood.

specific clinical findings for its support; 2) Dr. Douglas's mental status assessments were not particularly remarkable; 3) GAF assessments of 50-60 were inconsistent with the limitations stated in the report; and 4) there were unexplained discrepancies in which a single report indicated both the existence and the absence of suicidal ideation.

The ALJ's rejection of Dr. Douglas's opinions on the ground that they were contained on a check-the-box form is insufficient because, as mentioned, the ALJ accepted the opinions of one-time examiner Dr. Wood, also contained on a check-the-box form.

The ALJ's rejection of Dr. Douglas's opinions because they contradicted his mental status examination findings is legitimate, as discussed.

The fact that Dr. Douglas assessed Ms. Werner's GAF at 50 or 60 is a legitimate, though not strongly probative, reason for rejecting Dr. Douglas's opinions. A GAF of 60 is not inconsistent with substantial incapacity and marked disability. See Schneider v. Commissioner, 223 F.3d 968, 974(9th Cir. 2000). However, GAFs of 50 and 60, which indicate "moderate" symptoms and "serious" symptoms, respectively, are inconsistent with Dr. Douglas's opinion that Ms. Werner's depression was so debilitating that she had "profound" difficulty functioning and "continual" episodes of decompensation.

The discrepancy indicating the presence and absence of

suicidal ideation in a single report appears to be based on the ALJ's misreading of the record. Dr. Douglas's treatment notes say, "MDE - Sl. worse," and "Major Depression - Sl. worse." Tr. 685, 688. The ALJ appears to have read "Sl." not as an abbreviation for "slightly," but as "SI," the initials for "suicidal ideation." Such a reading, if correct, would indeed contradict the finding in the same report, under the heading "Suicide Assessment" that suicidal ideation was absent. But such a reading is not correct.

The pages in question clearly show a period at the end of "Sl." indicating that it is an abbreviated word rather than the initial letters of two words. Further, both times the "Sl." appears in Dr. Douglas's records, it is preceded by the words "Major Depression" or the initials "MDE" (Major Depressive Episode) and followed by the word "worse." If these notations are read as "Major Depression slightly worse" or "Major Depressive Episode slightly worse," instead of "Major Depression suicidal ideation worse," the discrepancy disappears. Nowhere in Dr. Douglas's treatment records does he indicate that Ms. Werner has suicidal ideation. Thus the former reading is more consistent with the record than the latter. The ALJ's rejection of Dr. Douglas's opinions on the basis of the perceived discrepancy is erroneous.

The ALJ rejected Dr. Douglas's September 2003 opinion,

which the ALJ also acknowledged would establish that Ms. Werner was disabled, see tr. 26, because 1) Dr. Douglas's report of Ms. Werner's limitations was inconsistent with daily activities she reported to Dr. Wood; 2) Dr. Douglas's own treatment notes did not reveal episodes of decompensation; and 3) Ms. Werner had more social contacts than Dr. Douglas recorded.

Ms. Werner told Dr. Wood, during the interview in June 2003, that she went to bed about midnight and awoke between 8:00 a.m. and 11:00 a.m. "if I get up." Tr. 705. She did not eat breakfast. Id. During the day, she watched TV, sewed, did yard work, or engaged in hobbies including art, painting, sculpting, carving, and building small items such as a birdbath. Id. Ms. Werner said she seldom did dishes or laundry, and did not sweep or mop, but that she vacuumed, shopped for groceries and drove. She said she had difficulty with her money because she spent more than she had, but said she could handle any money she received from disability. Id. She described herself as "self sufficient," and said she made minor repairs to her mobile home and took care of the yard. She said she could cook and follow recipes, but that she no longer read and that she socialized with "nobody." Id. She reported brushing her teeth once every two weeks and showering once every three months, but said she had taken a shower that morning. Id. Dr. Wood wrote that her grooming "appeared much better than someone who showers only 1 time per 3

months." Id.

Six months later, in September 2003, Dr. Douglas wrote that Ms. Werner "sleeps more than 16 hours per day, does not clean her house. Does ADLs [activities of daily living] only 1-2 times per week." Tr. 868. Dr. Douglas found that Ms. Werner had marked limitations in her activities of daily living, which included, among other things, cleaning, shopping, cooking, paying bills, maintaining a residence, and caring appropriately for one's grooming and hygiene.

I find no error in the ALJ's rejection of Dr. Douglas's opinion based on the activities Ms. Werner reported to Dr. Wood.

The ALJ rejected Dr. Douglas's opinion that Ms. Werner would have episodes of decompensation because when she ran out of medication or was unable to afford it, "she has a very predictable worsening of apathy and [activities of daily living] almost cease." Tr. 727. The basis for the rejection was that Dr. Douglas's treatment notes did not reveal episodes of decompensation. Dr. Douglas's treatment notes contain several references to Ms. Werner's reports of worsening apathy and decreases in activities of daily living during the course of her treatment: sleeping much of the day, tr. 683, 684, 690, 698, 699; struggles to maintain daily activities, tr. 689; depression that was "debilitating to the point where she has profound difficulties functioning," tr. 692, 697; and continued feelings

of hopelessness, tr. 690. But none of these notations is specifically tied to Ms. Werner's running out of medication or being unable to afford it. None is specifically identified as an episode of decompensation, and, as discussed, Dr. Douglas's unremarkable mental status examinations at every therapy session suggest that Dr. Douglas has no clinical basis for opining that Ms. Werner would be subject to continual episodes of decompensation. I find no error here.

The ALJ's final reason for rejecting Dr. Douglas's opinion was that Ms. Werner had more social contacts than Dr. Douglas recorded. Dr. Douglas wrote in September 2003 that Ms. Werner had less than two interpersonal contacts per week. Tr. 868. The ALJ found that this was inconsistent with Dr. Douglas's treatment note that she had reported having numerous supportive friends and family members, as well as her sister's report that she saw Ms. Werner on an almost daily basis. I agree.

Dr. Douglas's treatment notes show a heading, "Suicide Assessment," that contains several subheadings, among them Social Support." See, e.g., tr. 683. Under "Social Support," Dr. Douglas consistently checked the phrase, "Numerous Supportive Friends/Family." Id. Dr. Douglas's narratives in the treatment notes do not explain the discrepancy between his notation that Ms. Werner had "numerous supportive friends/family" and his statement that Ms. Werner had less than two interpersonal

45  - FINDINGS AND RECOMMENDATION

conatacts per week. Further, on September 21, 2003, Ms. Werner's sister reported seeing Ms. Werner "once every week or two, I live 40 miles away, and we talk on phone at least once [per] week." Tr. 429.

Dr. Douglas's statement in September 2003 that Ms. Werner had less than two interpersonal contacts a week is inconsistent with the existence of numerous supportive friends and family. Ms. Werner's sister's report of telephone calls at least once a week and visits every week or two indicates that Ms. Werner has more than two interpersonal contacts a week just with her sister. I find no error in the ALJ's reasoning.

3.   Did the ALJ err in rejecting the testimony of third party witnesses?

_____In his opinion, the ALJ found the statements of third party witnesses "credible to the extent that they are consistent with the reliable medical records," and "fully consistent with a histrionic personality." This credibility finding is legally insufficient. When the ALJ disregards the testimony of lay witnesses, he must "give reasons that are germane to each witness." Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993). General findings, such as "credible to the extent that they are consistent with the reliable medical records" are an insufficient basis to support an adverse credibility determination. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998); Holohan v. Massinari,

246 F.3d 1195, 1208 (9th Cir. 2001).

However, taken as a whole, the testimony of the third party witnesses is not indicative of disability, so the ALJ's error is harmless. Ms. Werner's former boyfriend, Dennis Sohler, stated on September 20, 2003 that she does not allow him to see her when she is in "extreme condition," and that when Ms. Werner's symptoms are not extreme, she can perform daily activities "on a limited basis." Tr. 422. Mr. Sohler also stated that Ms. Werner "can and does socialize at times," that she checks on her neighbors and "has always treated me real well." Id.

Ms. Werner's sister, Betty Cota, states that she sees Ms. Werner every week or two and that they talk on the phone at least once a week. Tr. 429. Ms. Cota says that she has not been invited into Ms. Werner's house recently and she is "wondering if it is really a mess." Tr. 430. Ms. Cota reports that Ms. Werner has contact with several neighbors, her daughter and granddaughter, herself and occasionally her former boyfriend. Id. Ms. Cota believes Ms. Werner's concentration and memory are poor, that Ms. Werner "bounces from subject to subject" when talking, and that she does not "think through the decisions she makes." Tr. 431. Ms. Cota also says, "I do know she has fibromyalgia which causes depression," and that she "sleeps a great deal, maybe from the meds." Tr. 432. One witness, Malinda Kaufmann, states that she has not seen Ms. Werner in "almost five years." Tr. 445.

4.    <u>Did the ALJ err in rejecting Dr. LeBray's opinion that Ms. Werner had moderate deficiencies in concentration, persistence, and pace?</u>

The ALJ took note of Dr. LeBray's findings, but rejected them because Dr. Wood's report did not disclose significant problems with concentration during cognitive testing. I find no error here. In general, the opinions of treating and examining practitioners are entitled to more weight than those of reviewing practitioners like Dr. LeBray. <u>Holohan v. Massanari</u>, 246 F.3d at 1202. Dr. LeBray's opinion about Ms. Werner's concentration, persistence and pace is directly contradicted by the results of the cognitive testing administered by examining psychologist Dr. Wood.

5.    <u>Did the ALJ err in finding that Ms. Werner had no severe physical impairments at step two of the sequential evaluation?</u>

A severe impairment is one that significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). An impairment or combination of impairments may be found not severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work. <u>Webb v. Barnhart</u>, 433 F.3d 683, 686 (9th Cir. 2005)(emphasis in original). Step two is a "de minimis screening device used to dispose of groundless claims," and an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his

48  - FINDINGS AND RECOMMENDATION

conclusion is clearly established by medical evidence.
Id.

Ms. Werner argues that her IBS, osteoarthritis of the fingers, and headaches constitute severe physical impairments that the ALJ should have considered in assessing her residual functional capacity. The ALJ found that the medical evidence did not show that Ms. Werner's alleged IBS caused significant limitations for 12 consecutive months, see 20 C.F.R. § 404.1509. The ALJ also noted the discrepancy between Ms. Werner's testimony that she had four episodes of bowel incontinence in the month of September 2003, but only once or twice a year before that.

Dr. Gundry diagnosed IBS in 2002, but that diagnosis was based on Ms. Werner's subjective reports; the medical record contains no clinical evidence of IBS, and Ms. Werner testified that a colonoscopy had revealed that her colon and bowel were normal. I find no error in the ALJ's conclusion that the IBS did not constitute a severe impairment.

There is substantial evidence in the record to support the ALJ's finding that Ms. Werner's alleged pain and swelling of the fingers was not a severe impairment. Although Ms. Werner frequently complained to her physicians of pain in her hands, Dr. Hasleton found no evidence of limitations on range of motion, muscle atrophy, wasting or asymmetry to her upper extremities. There are no x-rays or other objective clinical findings which

demonstrate the existence of a medical condition that would explain Ms. Werner's complaints of pain, swelling, weakness and numbness in her hands and fingers.

Ms. Werner testified that she suffers from severe headaches. Dr. Gundry has noted these complaints, as has Dr. Douglas. Tr. 560, 680, 685. However, there is no indication in the record that Ms. Werner has ever been treated for migraines or for severe headaches. The ALJ did not err in finding that Ms. Werner's headaches were not a severe impairment.

## Conclusion

Based on review of the record as a whole, I conclude that the ALJ's decision is free of legal error and based on substantial evidence. I recommend that the Commissioner's decision be affirmed.

## Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due May 28, 2007. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections

///

///

///

///

is due June 11, 2007, and the review of the Findings and Recommendation will go under advisement on that date.

DATED this 11th  day of May, 2007.

/s/ Dennis James Hubel
Dennis James Hubel
United States Magistrate Judge